IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

CINDY TABACCHI,                         )
                                        )
              Plaintiff,                )        Case No. Cv 05-3104-KI
                                        )
       vs.                              )        OPINION AND ORDER
                                        )
JO ANNE B. BARNHART, Commissioner       )
Social Security Administration,         )
                                        )
              Defendant.                )

        Robert F. Webber
        Black, Chapman, Webber, Stevens,
        Petersen & Lundblade
        930 W. 8th Street
        Medford, Oregon  97501

                Attorney for Plaintiff

        Karin J. Immergut
        Unites States Attorney
        District of Oregon
        Neil J. Evans
        Assistant United States Attorney
        1000 S.W. Third Avenue, Suite 600
        Portland, Oregon  97204-2902

Page 1 - OPINION AND ORDER

Thomas M. Elsberry
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington  98104-7075

      Attorneys for Defendant


KING, Judge:

Plaintiff Cindy Tabacchi brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB").  I reverse the decision of the Commissioner.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability.  The claimant has the burden of proof on the first four steps.  Bustamante v. Massanari, 262 F.3d 949, 953 (9th Cir. 2001); 20 C.F.R. §§ 404.1520 and 416.920.  First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

Page 3 - OPINION AND ORDER

If the claimant is unable to perform work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Bustamante, 262 F.3d at 954. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance. Id. "[T]he commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." Batson v. Barnhart, 359 F.3d 1190, 1193 (9th Cir. 2003) (internal citations omitted).

## THE ALJ'S DECISION

On August 5, 2002, Tabacchi's first District Court action was remanded based on the parties' stipulation that the ALJ should undertake certain tasks on rehearing. After the hearing on remand in 2005, the ALJ's decision noted that Tabacchi had to establish disability on or before December 31, 1993, when her insurance for disability benefits ended. Thus, the medical records from Tabacchi's cancer, discovered in 1997, are not relevant to the issue of disability on or before the date last insured of December 31, 1993.

The ALJ concluded that Tabacchi had severe impairments of systemic lupus erythematosus and chronic proctitis/ulcerative colitis. He disagreed with the first ALJ's conclusion that Tabacchi also had an anxiety disorder that was severe. The ALJ found that Tabacchi was not entirely credible and similarly gave very little weight to the testimony of her neighbor. Next, the ALJ discussed the opinion of Dr. Melnyk, who was Tabacchi's treating rheumatologist but who had only seen Tabacchi once prior to her date last insured. The ALJ gave very little probative weight to Dr. Melnyk's 1999 opinion that Tabacchi was unable to work as of the date of her first examination in December 1993. Based on his review of the evidence, the ALJ found that Tabacchi had the residual functional capacity to perform substantially all of the full range of sedentary work and could thus perform her past work as a receptionist. Additionally, Tabacchi was found to be "not disabled" under the grids. The ALJ concluded that at no time on or before Tabacchi's date last insured, December 31, 1993, was she disabled as defined by the Act.

The decision on remand is now before the court.

## FACTS

I will focus on evidence relevant to whether Tabacchi was disabled on or before her date last insured, December 31, 1993.

Tabacchi, who was 34 on the date last insured, alleges disability since December 31, 1988 due to systemic lupus erythematosus ("SLE") and ulcerative colitis. She has a Bachelor of Science degree and had worked as a food technician, receptionist, and food service worker.

During the hearing in 1999, Tabacchi stated that prior to 1992, her primary problem was fatigue but that in 1992, her joint pain significantly increased and became a problem along with

the fatigue.  She does not believe that she has had any significant change in symptoms since 1992.  Tabacchi naps in the mornings and afternoons.  There are three or four days during the average month when she is extremely tired, to the point of getting her daughter to school and back but unable to make dinner for the family.  At times, Tabacchi has as many as three weeks when she suffers this level of fatigue.  The joint pain is throughout her body and limits the time she can sit or stand.  On bad days, Tabacchi's neighbor would come and help her around the house, entertaining and caring for her small daughter.  But even on good days, Tabacchi would take a one or two hour nap in the afternoon when her daughter was napping.

At the hearing in 2005, Tabacchi stated that she could not remember if she was more tired in 1993 than in 1991.  Her memory of the entire time period is that she was exhausted all the time.  By 2005, Tabacchi's fatigue had improved after she stopped eating wheat.  She felt a lot better in 2005 than she did in 1993 but still had good and bad days.  On a bad day in 2005, Tabacchi would tidy up the kitchen in the morning and rest in a recliner for the remainder of the day.  The bad days occurred at least once a week and sometimes more.

The family employs a cleaning service for the house.  Tabacchi can sometimes pick up and put away things around the house.  Tabacchi can do simple food preparation at times but the family frequently relies on take-out food or frozen dinners.  She can wash two or three loads of laundry a week.  Her husband does the rest, about six loads, including changing the beds.  Tabacchi does most of the grocery shopping with occasional help from her husband.  Her husband washes the dishes.  Due to pain and fatigue, Tabacchi can no longer enjoy her hobbies of gardening, crocheting, knitting, dancing, skiing, and going out to movies or the theater.

Page 6 - OPINION AND ORDER

In 1999, Tabacchi considered trying consulting in the food industry but she did not think she had enough days when she felt well enough to permit even intermittent consulting. In 2005, Tabacchi's fatigue had improved enough to allow her to do some consulting work on a part-time basis. At the time of the hearing, however, she had only earned a few hundred dollars.

## DISCUSSION

I.    <u>Tabacchi's Subjective Symptom Testimony</u>

Tabacchi contends that the ALJ improperly rejected her subjective pain and fatigue testimony.

The ALJ found that Tabacchi's subjective complaints of constant fatigue and other disabling symptoms were not entirely credible and were inconsistent with her daily activities, use of prescribed medication, and the weight of the substantial evidence on record for the period through December 31, 1993. He noted the paucity of objective examination findings prior to that date, including no signs of weakness or tenderness and no signs of range of motion loss. The ALJ compared the subjective complaints to the reported activities of daily living, including cooking, shopping, taking care of a toddler, and housecleaning.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must (1) produce objective medical evidence of one or more impairments; and (2) show that the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1281-82 (9th Cir. 1996). The claimant is not required to produce objective medical evidence of the symptom itself, the severity of the symptom, or the causal relationship between the medically determinable impairment and the symptom. The

claimant is also not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. Id. at 1282. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. If there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if the ALJ makes specific findings stating clear and convincing reasons for the rejection, including which testimony is not credible and what facts in the record lead to that conclusion. Id. at 1284.

The ALJ's description of Tabacchi's daily activities is not supported by the record. I first note that her wage records indicate that she worked consistently from college graduation through 1988. Both Tabacchi and her neighbor, Francis Woodruff, reported that at least once a week, Tabacchi was so exhausted that Woodruff would come into Tabacchi's home to take care of her preschool child, or in later years would take the child to school. On those days, Tabacchi remained in a recliner resting for the entire day. Her husband would bring take-out food home to feed the family at dinnertime. Her husband did the vast majority of housecleaning and laundry that was not done by the hired cleaning service. When Tabacchi did a household task on good days, she paced herself and spread the task throughout the day.

Tabacchi was being treated for the colitis, or other related illnesses, well before her date last insured. Although the SLE gave her joint pain, it appears that the primary problem keeping her from working in 1993 was her fatigue. The ALJ has not noted any treatments that could have alleviated this problem or that were offered to Tabacchi. The final diagnosis of SLE took a few years to become apparent.

Page 8 - OPINION AND ORDER

I also note that Tabacchi was not shy to admit that she could not remember certain details to answer some of the ALJ's questions about her condition twelve years earlier.  But the facts she did remember do not appear to be exaggerated.  I conclude that the ALJ did not state clear and convincing reasons for rejecting Tabacchi's credibility.

II.    <u>Lay Testimony</u>

Tabacchi's neighbor, Francis Woodruff, testified that once a week Tabacchi was so tired that Woodruff would take her child to school for her.  The ALJ tried to determine the date more accurately:

Q    Now, in, now, in 1992, was her daughter old enough to go to school?

A    No.

Q    So, you – I mean, we're not –

A.    No.

Q    – talking about way back then.  We're talking more –

A    More –

Q    – of the current –

A    – more, when she – you know, more when the – starting school, you know, in the school years –

Q    Okay.

A    – when she was – I used to spend some time with her before she – kind of helped Cindy out before she went to school.

Q    So, were you helping her back in 1992 and '93 as far as if she had, was having a day that she couldn't do anything?

A    Uh-huh.  Yeah.  I, I'd go over and maybe, you know, stay with her daughter for awhile and do things with her.

Page 9 - OPINION AND ORDER

Q        Would the frequency of those bad days be the same as, as you had testified here earlier, once a week?

A        Yes, uh-huh.

Tr. 60-61.

Tabacchi contends that the ALJ improperly rejected the testimony of Frances Woodruff, Tabacchi's neighbor.

The ALJ noted that Woodruff's 1999 recollection of the dates was suspect because Tabacchi's daughter was only four years old in December 1993 and thus not old enough to be in kindergarten.  He also considered the testimony to be overall vague.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.  A medical diagnosis, however, is beyond the competence of lay witnesses.  Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).  A legitimate reason to discount lay testimony is that it conflicts with medical evidence.  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

Woodruff not only testified that she drove the child to school about once a week but that before the child was school age, Woodruff would go to Tabacchi's home and help care for the child.  Woodruff's testimony was not vague.  Woodruff moved to the neighborhood in 1989, the Tabacchis moved in two years later in 1991, and the two women became friendly a year later in 1992.  Woodruff began helping out then at the rate of once a week.  I conclude that the ALJ's reason for rejecting Woodruff's testimony is not supported by the record.

III.    Opinion of Treating Physician

Tabacchi contends that the ALJ improperly rejected the opinion of her treating rheumatologist, Dr. Melnyk.

Page 10 - OPINION AND ORDER

Prior to her date last insured, Dr. Binette examined Tabacchi on November 5, 1993 to evaluate her rectal bleeding.  He noted that she had a recent diagnosis of SLE but that she had not required therapy since her symptoms are fairly minimal.

Dr. Melnyk first examined Tabacchi on December 1, 1993.  Tabacchi had recently been diagnosed with SLE and complained that for several years, she had significant fatigue and a fair amount of joint discomfort.  Her ulcerative proctitis symptoms were basically resolved with medication.  At that time, Tabacchi was not working but told Dr. Melnyk that she was thinking of consulting in the food industry.

On February 24, 1994, Dr. Melnyk noted that Tabacchi was "actually doing quite well." Tr. 172.  Her bowel symptoms had settled down.  Her only complaint was increasing problems with headaches, possibly stress-related, that resolved with Xanax.

On July 28, 1994, Dr. Melnyk noted that Tabacchi had noticed a definite increase in her arthralgias and tendency towards skin rashes as well as generalized nausea and headachy feeling prior to her menses.

On February 25, 1999, Dr. Melnyk signed a statement drafted by Tabacchi's attorney based on their conversation.  It states:

> You indicated that you have been treating Ms. Tabacchi since December 1993.  It is your opinion that she has been totally disabled since the time she first became your patient, which you indicated in your chart note dated August 5, 1998. It is your medical opinion that she is, and has been, disabled by a combination of arthritis and fatigue.  She also has lupus and colitis which can also give arthritis symptoms.  It is your opinion that on the days Ms. Tabacchi could get up and get into the office, she would be moving slowly, would be in a lot of pain, she would be tired and may not be able to complete a day.  You indicated that this had been ongoing for quite awhile prior to her starting treatment with you because your chart note of December 1, 1993 states that she had symptoms long before first being seen by you.  It is also your opinion that she would have had difficulty sitting or standing because she would stiffen up and would need to get up and

Page 11 - OPINION AND ORDER

move around frequently or her symptoms would increase.  She would also be limited in her range of motion and would be unable to do repetitive work.  You felt that, based on Ms. Tabacchi's symptoms which were and are significant, she would not be reliable on a day to day basis because she may be able to perform a task one day, but not the next.  Based on your knowledge of your patient, you felt that she would be incapacitated (unable to go to work) 2-3 times per week.  You stated that when you first started seeing Ms. Tabacchi, she may have been even more incapacitated due to a lack of treatment.

Although some of your chart notes say that she is doing "well," you stated that means she is stable and not progressively getting worse, nor is she in unbearable pain.  It does not mean that the symptoms are gone.

Tr. 395-96.

At the 2005 hearing, the medical expert testified that Dr. Melnyk's chart note from the December 1, 1993 examination shows that Tabacchi's SLE was "very, very mild" at that point since the doctor found no evidence of inflammation of the lining of the joints, no evidence of vasculitis problems, no evidence of kidney involvement, and no evidence that the SLE was affecting other body systems which can be damaged by the disease, including the brain, the heart, and the eyes.  Further, Dr. Melnyk did not see the need to start any kind of therapy.  Tr. 481-82, 484.

The ALJ rejected Dr. Melnyk's retrospective opinion because at no time through June 1994 did Dr. Melnyk or any other examining physician note any significant or recurrent positive sign of tenderness, range of motion loss, weakness, gait abnormality, or other neurological deficit.  The ALJ also noted that Tabacchi reported discomfort and a dull ache, rather than pain, which was adequately treated by over-the-counter medications.  "Given the claimant's reported daily activities as discussed above, the rather benign objective examination history prior to December 31, 1993, and Dr. Goodman's [the medical expert] questions concerning the reliability

of Dr. Melnyk's opinion, the undersigned gives Dr. Melnyk's opinion very little probative weight." Tr. 419.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. Lester, 81 F.3d at 830. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. Id. at 831. Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by and are consistent with other evidence in the record. Morgan v. Commissioner of Social Security Administration, 169 F.3d 595, 600 (9th Cir. 1999).

As analyzed above, the record does not support the ALJ's reliance on a discrepancy between Tabacchi's daily activities and Dr. Melnyk's opinion. It is true, however, that the medical records prior to December 31, 1993 indicate problems but not at a disabling level. This was confirmed by the medical expert. I also have concerns about the ability of Dr. Melnyk to give an opinion over five years later which is not documented in her single examination note prior to the date last insured. Primarily based on the ALJ's reliance on the medical expert's

Page 13 - OPINION AND ORDER

opinion, I conclude that he has given clear and convincing reasons to reject Dr. Melnyk's opinion

regarding disability in December 1993.

IV.    Remedy

The court has the discretion to remand the case for additional evidence and findings or to

award benefits. Smolen, 80 F.3d at 1292. The court should credit evidence and immediately

award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence,

there are no issues to be resolved before a determination of disability can be made, and it is clear

from the record that the ALJ would be required to find the claimant disabled if the evidence is

credited. Id. If this test is satisfied, remand for payment of benefits is warranted regardless of

whether the ALJ might have articulated a justification for rejecting the evidence. Harman v.

Apfel, 211 F.3d 1172, 1178-79 (9th Cir. 2000), cert. denied, 531 U.S. 1038 (2000).

The "crediting as true" doctrine resulting in an award of benefits is not mandatory in the

Ninth Circuit, however. Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003). The court has

the flexibility to remand to allow the ALJ to make further determinations, including

reconsidering the credibility of the claimant. Id. On the other hand, "in the unusual case in

which it is clear from the record that the claimant is unable to perform gainful employment in the

national economy, even though the vocational expert did not address the precise work limitations

established by the improperly discredited testimony, remand for an immediate award of benefits

is appropriate." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004).

Because of the time lag due to the last remand, a second remand would not shed any

additional light on the issue. I will credit the testimony of Tabacchi and Woodruff. They both

clearly state that in December 1993, prior to her date last insured, Tabacchi was unable to

function at least one day a week.  Thus, she would not be able to attend work reliably enough to maintain competitive employment.  Accordingly, I make a finding that Tabacchi was disabled on December 1, 1993.

## CONCLUSION

The decision of the Commissioner is reversed.  The case is remanded for a finding of disability.

IT IS SO ORDERED.

Dated this ____28th_____ day of September, 2006.

    ___/s/ Garr M. King_____
    Garr M. King
    United States District Judge

Page 15 - OPINION AND ORDER